# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
HOLLY SUGAR CORPORATION, et al.,        )
                                        )
        Plaintiffs,                     )
                                        )
        v.                              )
                                        )       Civil Action No. 03-1739 (RBW)
ANN M. VENEMAN, SECRETARY,              )
U.S. DEPARTMENT OF AGRICULTURE, et al., )
                                        )
        Defendants.                     )
_____ )

## AMENDED MEMORANDUM OPINION[1]

The plaintiffs are challenging the defendants' interpretation of § 163 of the Federal

Agricultural Improvement and Reform Act of 1996, Pub. L. No. 104-127, 110 Stat. 935 ("FAIR

Act" or "1996 Act"), as amended by § 1401(c)(2) of the Farm Security and Rural Investment Act

of 2002, Pub. L. No. 107-171, 116 Stat. 187 ("FSRI Act" or "2002 Act"), and codified as

amended at 7 U.S.C. § 7283, as applied to loans made by the Commodity Credit Corporation

("CCC") to sugar producers.  Amended Complaint for Declaratory Judgment, Restitution and

Injunctive Relief ("Compl.") ¶¶ 1-6.  Currently before this Court are (1) the Defendants' Motion

to Dismiss ("Defs.' Mot.") and (2) the Plaintiffs' Motion for Summary Judgment and Opposition

to Defendants' Motion to Dismiss ("Pls.' Opp'n").  For the following reasons, this Court grants

---

[1] On September 15, 2004, this Court issued a Memorandum Opinion in this case. Holly Sugar Corp. v. Veneman, 335 F. Supp. 2d 100 (D.D.C. 2004).  On September 25, 2004, the plaintiffs filed a motion to alter the ruling rendered in part II.B of the September 15, 2004 Opinion.  After reviewing the plaintiffs' motion, this Court has concluded that the motion should be granted and an amended opinion should be issued.  Accordingly, part II.B of the original opinion is being amended by this amended opinion.  Because the plaintiffs' motion only sought to alter part II.B of the September 15, 2004 Opinion, the remaining portions of the September 15, 2004 Opinion remain in force, with the exception of minor stylistic edits.

the plaintiffs' motion for summary judgment and denies in part the defendants' motion to

dismiss.

## I.  **Background**

Beginning in the 1940s and continuing to the present, Congress has provided loan

assistance to farmers to "support" the prices of agriculture commodities.[2]  See Agricultural Act

of 1949, Pub. L. No. 81-438, 63 Stat. 1051; Defendants' Statement of Points and Authorities in

Support of Her Motion to Dismiss ("Defs.' Mem.") at 2-3.  The United States Department of

Agriculture ("USDA"), through the CCC, makes these loans to, among others, sugar producers in

order to support a set level of pricing for sugar.[3]  See 7 U.S.C. §§ 7272, 7991(a).  In 1988, the

CCC promulgated a regulation that established a uniform policy for assessing interest on such

loans.  The regulation provided that the interest rate that the CCC would charge on agricultural

loans would be the same rate the United States Treasury charged the CCC to borrow the funds to

finance the loans, which was the formula in effect on October 1, 1995.  See 7 C.F.R. § 1405.1

(1989).  This regulation, which has since been amended, was promulgated based upon the CCC's

interpretation of 15 U.S.C. §§ 714b(l) and 714c(a), (d), provisions which list the general and

specific powers of the CCC.  Defs.' Mem. at 4-5.  Under § 714b(l), the CCC "[m]ay make such

---

[2] Congress has provided loan support for agricultural commodities, and in particular sugar, by making non-recourse loans.  7 U.S.C. § 7272(e).  With regard to related sugar commodities, these loans require sugar producers to provide sugar as collateral, see 7 C.F.R. § 1435.103(a)(3), as a condition for receiving the loans.  In the event of a loan default, the CCC has no legal recourse to require repayment, but it can sell the sugar submitted as collateral on the open market to recoup the loan funds.  7 C.F.R. § 1435.105.  The purpose of such loans are to help stabilize, support and protect farm income and prices and for the "maintenance of balanced and adequate supplies of agricultural commodities . . . ."  15 U.S.C. § 714.

[3] Specifically, the CCC provides loans to processors of domestically grown sugarcane and sugar beats, which are being collectively referred to by the Court as "sugar" and the loans to such processors as "sugar loans."  7 U.S.C. § 7272(a), (b).

loans and advances of its funds as are necessary in the conduct of its business."  And pursuant to § 714c, the CCC is required to "[s]upport the prices of agricultural commodities through loans, purchases, payments, and other operations" and "[r]emove and dispose of or aid in the removal or disposition of surplus agricultural commodities."  15 U.S.C. § 714c(a), (d).

However, in 1996, Congress passed the FAIR Act.  Under this Act, Congress mandated that the CCC set interest rates for loans, including loans to sugar producers, at a rate equal to the rate it cost the CCC to borrow the funds from the United States Treasury, plus an additional 100 basis points, or one percent.  7 U.S.C. § 7283(a); 1996 Act § 163.  The provision specifically stated:  "Notwithstanding any other provision of law, the monthly Commodity Credit Corporation interest rate applicable to loans provided for agricultural commodities by the Corporation shall be 100 basis points greater than the rate determined under the applicable interest rate formula in effect on October 1, 1995."  7 U.S.C. § 7283(a).   The CCC amended its regulations to reflect this Congressionally mandated change.  See 7 C.F.R. § 1405.1 (1997).

In 2002, Congress again amended the loan program with the adoption of the FSRI Act. The 2002 Act added the following subsection to 7 U.S.C. § 7283:  "(b) Sugar — For purposes of this section, raw cane sugar, refined beet sugar, and in-process sugar eligible for a loan under section 7272 of this title shall not be considered an agricultural commodity."  7 U.S.C. § 7283(b) (emphasis added).  The 2002 Act did not alter subsection (a) of § 7283, which requires that 100 basis points be added to the interest rate on the loans, nor did the 2002 Act alter the ability of sugar producers to secure agricultural commodity loans under 7 U.S.C. § 7272 (discussing loan program for sugar).  The amendment simply exempted sugar from the 100 basis point requirement.  The 2002 Act also added the following, a no net cost provision, to 7 U.S.C. § 7272:

(g)(1) IN GENERAL – Subject to subsection (e)(3), to the maximum extent practicable, the Secretary shall operate the [loan] program established under this section at no cost to the Federal Government by avoiding the forfeiture of sugar to the Commodity Credit Corporation.

7 U.S.C. § 7272(g)(1).

Despite this most recent amendment of § 7283(b), the CCC and the USDA have concluded that the legislation did not mandate a new interest formula for sugar, but merely lifted the requirement of the 100 basis point premium, and thus they could charge whatever interest rate they deemed appropriate.  The CCC published its reasoning in the Federal Register:

The 2002 Act eliminates the requirement that CCC add 1 percentage point to the interest rate as calculated by the procedure in place in 1996 but does not establish a sugar loan interest rate.  CCC has decided to use the rates required for other commodity loans.

67 Fed. Reg. 54,927 (Aug. 26, 2002).  Based upon this reasoning, the CCC has continued to charge an additional one percent interest point on sugar loans.

## II.  The Parties' Arguments

The plaintiffs have filed a four count complaint challenging the defendants' continued assessment of an additional one percent interest point on sugar loans despite the 2002 Act. Specifically, the plaintiffs allege that the defendants' actions (1) violate the express terms of the 2002 Act; (2) are arbitrary, capricious, and an abuse of discretion under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A); (3) have resulted in the United States being unjustly enriched; and (4) amount to an unconstitutional tax.  Compl. ¶¶ 48, 51, 61, 67.  Thus, the plaintiffs seek (1) a declaratory judgment that the defendants' actions violate the 2002 Act and the Constitution; (2) an injunction prohibiting the defendants from continuing to charge the additional one percent interest point on sugar loans; and (3) an order directing the defendants to

pay restitution to the plaintiffs in an amount equal to the amount the defendants have been unjustly enriched through the collection of the additional one percent interest assessment. Compl. ¶¶ A., B., C.

The defendants have moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Specifically, the defendants argue that the plaintiffs' Administrative Procedure Act ("APA") claim must fail because there is no ambiguity in the statute at issue.  Defs.' Mem. at 11.  The defendants note that the 2002 Act removed sugar from the definition of "agricultural commodity," which they opine left the CCC free of any requirement to use a particular formula for setting interest rates on sugar loans.  Id. at 11-12. Thus, the defendants posit that the CCC has the authority to charge whatever interest rate it deems appropriate so long as the interest rate is consistent with the CCC's general and specific powers listed in 15 U.S.C. §§ 714b(j), (k); 714c(a), (d).  Id.  Therefore, the defendants contend that this Court must give deference to the agency's decision as required by Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).  Id. at 14.  The defendants further argue that the additional one percentage point interest fee is not a tax under the Constitution as the plaintiffs contend, but rather, is a permissible fee associated with the loan process.  Id. at 14-17.  Finally, the defendants assert that the plaintiffs' claim of unjust enrichment cannot survive their motion to dismiss because (1) the plaintiffs do not assert that the loan agreement has been breached and (2) the government is shielded from recovery on this claim by the doctrine of sovereign immunity.  Id. at 17-18.

The plaintiffs have moved for summary judgment pursuant to Rule 56(a).  Pls.' Opp'n  at 23.  The plaintiffs contend that the CCC's interpretation of the 2002 Act is contrary to the plain

language of the Act and should, therefore, not be given <u>Chevron</u> deference.  <u>Id.</u> at 25.  The

plaintiffs opine that Congress placed the sugar exemption in the same statutory provision that

mandates the additional one percent interest charge in order to specifically exempt sugar from

that additional one percent requirement, thereby reducing the interest rate charged on sugar loans.

<u>Id.</u>  The plaintiffs argue that this reading is supported by the plain language of the statute and

application of basic cannons of statutory construction.  <u>Id.</u> at 26.  The plaintiffs further argue that

the legislative history supports their reading of the statute.  <u>Id.</u> at 26-27.  They also state that the

additional one percent interest charge is an unconstitutional tax because it is a payment that "is

arbitrary and was created solely for a public purpose."  <u>Id.</u> at 37.  Finally, the plaintiffs posit that

the CCC is being unjustly enriched by the assessment because it has illegally collected payments

from the plaintiffs.  <u>Id.</u> at 39.  Therefore, the plaintiffs claim that they are entitled to restitution in

an amount equal to the amount the CCC has been unjustly enriched.  <u>Id.</u> at 39-40.

### III.  <u>Standards of Review</u>

**(A)     Motion to Dismiss Under Rule 12(b)(1)**

Under Rule 12(b)(1), which governs motions to dismiss for lack of subject matter

jurisdiction, "[t]he plaintiff bears the burden of persuasion to establish subject matter jurisdiction

by a preponderance of the evidence."  <u>Pitney Bowes, Inc. v. United States Postal Serv.</u>, 27 F.

Supp. 2d 15, 19 (D.D.C. 1998).  In reviewing such a motion, this Court must accept as true all

the factual allegations contained in the complaint.  <u>Leatherman v. Tarrant County Narcotics</u>

<u>Intelligence & Coordination Unit</u>, 507 U.S. 163, 164 (1993).  Additionally, in deciding a Rule

12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations

in the complaint, but may also consider material outside of the pleadings in its effort to determine

whether the court has jurisdiction in the case.  See EEOC v. St. Francis Xavier Parochial Sch.,

117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997); Herbert v. Nat'l Acad. of Sciences., 974 F.2d 192,

197 (D.C. Cir. 1992); Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987); Grand Lodge of

Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001).

**(B)     Motion to Dismiss Under Rule 12(b)(6)**

On a motion to dismiss for failure to state a claim upon which relief can be granted

pursuant to Rule 12(b)(6), this Court must construe the allegations and facts in the complaint in

the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences

that can be derived from the facts alleged.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Barr v.

Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing Kowal v. MCI Communications Corp., 16

F.3d 1271, 1276 (D.C. Cir. 1994)).  However, the Court need not accept asserted inferences or

conclusory allegations that are unsupported by the facts set forth in the complaint.  Kowal, 16

F.3d at 1276.  In deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only

consider the facts alleged in the complaint, documents attached as exhibits or incorporated by

reference into the complaint, and matters about which the Court may take judicial notice.  St.

Francis, 117 F.3d at 624-25.  The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the

defendant can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief."  Conley, 355 U.S. at 45-46.

**(C)     Motion for Summary Judgment Under Rule 56(a)**

This Court will grant a motion for summary judgment under Rule 56(c) if "the pleadings,

depositions, answers to interrogatories and admissions on file, together with the affidavits or

declarations, if any, demonstrate that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, this Court must view the evidence in the light most favorable to the non-moving party. Bayer v. United States Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992).

**(D)   Chevron Deference**

Under the APA, 5 U.S.C. § 706(2)(A), this Court may vacate a decision by the USDA only if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." This standard is highly deferential to the agency. See Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Chevron deference applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." United States v. Mead Corp., 533 U.S. 218, 226-27 (2001); see also Robert Wood Johnson Univ. Hosp. v. Thompson, 297 F.3d 273, 281 (3d Cir. 2002). The Court is required to apply a two-step analysis pursuant to Chevron. First, "if the statute speaks clearly 'to the precise question at issue,'[the Court] 'must give effect to the unambiguously expressed intent of Congress.'" Barnhart v. Walton, 535 U.S. 212, 217-18 (2002) (quoting Chevron, 467 U.S. at 842-43). Second, where the statute is "silent or ambiguous with respect to the specific issue," courts must sustain the agency decision if it is based on a "permissible construction" of the statute. Chevron, 467 U.S. at 843. A court does not need to reach this second step, however, if "employing traditional tools of statutory construction, [it] ascertains that Congress had an intention on the precise question at issue . . . ." Id. at 843 n.9.

### III.   Legal Analysis

**(A)      Is the USDA's Decision Entitled to Chevron Deference?**

This Court agrees with the parties' position that the plain language of the statute clearly

and unambiguously indicates Congress' intent and, therefore, this Court need not address

Chevron's second-prong.  Defs.' Mem. at 11; Pls.' Opp'n at 25.  However, the parties have

different views on Congress' intent.  The defendants contend that the 2002 Act only removed

sugar from the definition of "agricultural commodity" for the limited purpose of 7 U.S.C. § 7283.

Defs.' Mem. at 11.  Thus, by removing sugar from that section, the defendants opine that

Congress' intent was to give the CCC authority to utilize any formula it deemed appropriate in

determining the loan rate for sugar, so long as it was within the scope of the CCC's general and

specific powers.  Id. at 12.  The plaintiffs contend, however, that by removing sugar from the

definition of "agricultural commodity," Congress intended for sugar to be treated differently than

other agricultural commodities.  Pls.' Mem. at 26.  Thus, according to the plaintiffs, the

additional one percentage interest point that the CCC continues to charge on sugar loans is

clearly contrary to the current version of § 7283(b), as doing so renders the 2002 amendments

meaningless.  Id.  Furthermore, the plaintiffs opine that it is clear from the legislative history of

the amendments that Congress intended for the interest rate on sugar loans to be reduced.  Id. at

26-27.

In determining whether Chevron deference should be accorded agency action, this Court

must first determine, by "employing traditional tools of statutory construction," whether

"Congress had an intention on the precise question at issue . . . ."  Chevron, 467 U.S. at 843 n.9.

"The primary and general rule of statutory construction is that the intent of the lawmaker is to be

found in the language that he has used." United States v. Goldenberg, 168 U.S. 95, 102-03 (1897). "[I]t is an elementary principle of statutory construction that, in construing a statute, [this Court] must give meaning to all the words in the statute." Lewis v. Barnhart, 285 F.3d 1329, 1332 (11th Cir. 2002) (per curiam) (citations omitted) (emphasis in original).  "[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." Lamie v. United States Tr., 540 U.S. 526, ____, 124 S.Ct. 1023, 1030 (2004).  Thus, in such situations, "resort to legislative history is not appropriate in construing the plain statutory language." United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 494 (D.C. Cir. 2004).  If the plain meaning of the statute leads to an "absurd or futile result[], however, [the Supreme] Court has looked beyond the words to the purpose of the act." Perry v. Commerce Loan Co., 383 U.S. 392, 400 (1966) (quoting United States v. American Trucking Ass'ns, 310 U.S. 534, 543 (1940)).  The District of Columbia Circuit has held that  "literal interpretation need not rise to the level of 'absurdity' before recourse is taken to the legislative history, . . . [but] there must be evidence that Congress meant something other than what it literally said before a court can depart from plain meaning." Engine Mfrs. Ass'n v. EPA, 88 F.3d 1075, 1088 (D.C. Cir. 1996).  Moreover, when examining the plain meaning of the statute, the Court must not interpret the statute in such a manner that renders another part of that statute or another statute superfluous.  Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 35 (2003).   Finally, when faced with both a specific and general statute, this Court must interpret the provisions in a manner that makes the specific statute controlling.  Edmond v. United States, 520 U.S. 651, 657 (1997).

In this case, the Court need not reach the second Chevron question because it concludes,

as both parties do, albeit from different perspectives, that Congress' intent is clear.  In the Court's

view, without question, 7 U.S.C. § 7283(a) limits the CCC's authority to set interest rates for

loans on agricultural commodities.  This provision clearly requires that the interest rate on such

loans be one percent greater than the rate charged to the CCC by the United States Treasury to

borrow the funds to finance the loans.  Thus, the section mandated a one percent <u>increase</u> above

the rate that the CCC charges on all <u>agricultural commodity</u> loans pursuant to the pre-existing

formula.  Prior to the 2002 Act, this one percent add on undoubtedly applied also to loans for

sugar commodities.  However, pursuant to the 2002 Act, as codified in 7 U.S.C. § 7283(a)-(b),

sugar loans are expressly exempted from the imposition of the one percentage point increase.

The 2002 Act did not in any other way affect the ability of sugar producers to seek loan

assistance through the CCC, the Act simply altered the interest rate for such assistance.  By

specifically mandating that the increase would no longer apply to sugar, Congress clearly

intended for the interest rate for sugar loans to be <u>decreased</u> by one percent.  To conclude

otherwise would render meaningless Congress' unambiguous amendment contained in the 2002

Act.

　　　　The CCC maintains, however, that because Congress did not specifically state what the

interest rate for sugar should be, but rather only indicated what it should not be, Congress gave

the CCC authorization to charge any rate it deemed appropriate so long as that rate is in line with

the CCC's general and specific powers codified at 15 U.S.C. §§ 714b(l) and 714c(a), (d).  Defs.'

Mem. at 11-12.  Thus, pursuant to these statutory powers, the CCC argues that it is permitted to

charge the additional one percent above the rate charged to it by the United States Treasury.  <u>Id.</u>

Despite the CCC's creative argument, Congress' intent was clear—the interest rate on sugar is

now exempt from the additional one percent interest rate increase and thus, the rate is decreased

by one percent.  Therefore, when reduced by one percent, the net effect of the 2002 Amendment

is that the interest loan rate for sugar is the amount calculated by using the interest rate formula in

effect on October 1, 1995, or the same rate that the CCC pays to the United States Treasury to

borrow the funds to finance the loans.  If this Court were to conclude that the CCC could impose

the additional one percent pursuant to its statutory powers set forth in 15 U.S.C. §§ 714b(l) and

714c(a), (d), despite Congress' mandate otherwise, it would be interpreting the statute in a

manner that would give no effect to 7 U.S.C. § 7283(b) as now drafted, thus making it

superfluous, which this Court cannot do.  See Dastar Corp., 539 U.S. at 35.  Furthermore, even if

this Court could conclude that the CCC's statutory powers under 15 U.S.C. §§ 714b(l) and

714c(a), (d) permit the CCC to set interest rates, these powers are clearly not specific to the

precise issue presented to the Court here, i.e., whether the CCC may charge an additional one

percent where 7 U.S.C. § 7283 clearly indicates otherwise.  Thus, this Court cannot read the

general statutory provision governing the CCC's powers as trumping the more specific and clear

interest provision of 7 U.S.C. § 7283.[4]  See  Edmond, 520 U.S. at 657.

 For the foregoing reasons, the CCC's decision to charge an additional one percentage

interest point on sugar loans is contrary to the clear language of the 2002 Act, as codified in 7

---

[4]  The defendants also rely on the 2002 Act's no net cost provision as support for its contention that the
CCC has the ability to charge whatever interest rate it deems appropriate so long as the rate is within the scope of the
CCC's statutory powers codified at 15 U.S.C. §§ 714b(l) and 714c(a), (d). Defs.' Mem. at 13.  However, the
defendants' argument has no merit since it is clear that 7 U.S.C. § 7283 speaks directly and specifically to the issue
in dispute—the rate which the CCC can charge to fund sugar loans—while the no net cost provision, 7 U.S.C.
§ 7272(g)(1), is merely a general provision requiring that the CCC strive to operate the loan existence program, "to
the maximum extent practicable[,] . . . at no cost to the Federal Government."  See  Edmond, 520 U.S. at 657.

U.S.C. § 7283.[5]  Therefore, this Court affords no deference to the agency's interpretation of the 2002 amendment and it must grant the plaintiffs' motion for summary judgment with respect to counts one and two of the amended complaint and deny the defendants' motion to dismiss these two counts.[6]

### (B)   Can the Plaintiffs Maintain Their Claim for Unjust Enrichment Against the Government?

In count three of the amended complaint, the plaintiffs contend that the additional one percent assessment has resulted in the defendants being unjustly enriched.  Compl. ¶ 58.  Thus, the plaintiffs seek restitution in the amount equal to the amount the defendants have allegedly been unjustly enriched.  Compl. ¶ C.  The defendants have moved to dismiss this count of the amended complaint because they claim that the doctrine of sovereign immunity bars the claim.  Defs.' Mem. at 18.  Additionally, the defendants, by directing this Court to Albrecht v. Comm. of Employee Benefits, 357 F.3d 62 (D.C. Cir. 2004), appear to argue that unjust enrichment in not an appropriate claim when there is an express contract, i.e., the loan agreements, that specifically addresses the question at issue, i.e., the interest rate payable on the loans.  Defendants' Notice of Supplemental Authority.

This Court's September 15, 2004 Opinion denied the plaintiffs claim for unjust

---

[5]  While this Court need not engage in a review of the legislative history to reach this conclusion, the legislative history on point provides further support for this Court's holding.  See S. Rep. No. 107-117, at 100 (2001) (stating that the 2002 Act "reduces the CCC interest rate on sugar loans by 100 basis points"); H.R. Rep. No. 107-191, pt. I at 89 (2001)  (noting that the 2002 Act "reduces the CCC interest rate on price support loans"); To Review the Implementation of the 2002 Farm Bill: Hearing Before the Senate Committee on Agriculture, Nutrition, and Forestry, 108th Cong. at 20 (2003) (statement of Senator Conrad) (discussing the repeal of the interest rate "surcharge" and concluding:  "[n]ow why ever would we have repealed it if we did not intend for that to actually be implemented?").  _____

[6]  Because the Court concludes that the defendants' actions were contrary to the plain language of the statute, it will not address the plaintiffs' claim that the additional one percent interest charge is an unconstitutional tax.

enrichment as a matter of law after concluding that this remedy is not available when an express

contract prescribes the parties' relationships.  Holly Sugar, 335 F. Supp. 2d at 108-09.  After a

careful review of the Plaintiffs' Emergency Motion to Alter of Amend Judgment and Statement

of Points and Authorities ("Pls.' Recons. Mot."); the Defendants' Opposition to Plaintiffs'

Emergency Motion to Alter or Amend Judgment ("Defs.' Opp'n to Pls.' Recons. Mot."); and the

Plaintiffs' Reply to the Opposition of the Defendants to the Motion to Alter or Amend the

Judgment ("Pls.' Reply to Defs.' Opp'n"), the Court must conclude that the plaintiffs' motion

should be granted and the section of the Court's prior opinion that addressed the subject must be

revised.

       The Court begins first with the defendants' second argument.  "'The doctrine of unjust

enrichment has at all times been fundamentally equitable in nature, notwithstanding its long

association with the law of contracts.'"  In re Lorazepam & Clorazepate Antitrust Litig., 295 F.

Supp. 2d 30, 50 (D.D.C. 2003) (quoting BCCI Holdings (Luxembourg)  Societe Anonyme v.

Khalil, 56 F. Supp. 2d 14, 64 (D.D.C. 1999)).  In order to state a claim for unjust enrichment, the

plaintiffs "must establish that:  (1) they conferred a legally cognizable benefit upon [the]

[d]efendants; (2) [the] [d]efendants possessed an appreciation or knowledge of the benefit; and

(3) [the] [d]efendants accepted or retained the benefit under inequitable circumstances."  Id.

(citing  Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am. v. Ass'n of

Flight Attendants, AFL-CIO, 864 F.2d 173, 177 (D.C. Cir. 1988).  "'To qualify for an award of

restitution under th[e] theory [of unjust enrichment], [the plaintiffs] must show that [they]

conferred a benefit (usually money) on [the defendants] under circumstances in which it would

be unjust or inequitable for [the defendants] to retain the benefit.'"  Id. at 50-51 (quoting BCCI

Holdings, 56 F. Supp. 2d at 64-65 (citations omitted)).  However, "there can be no claim for unjust enrichment when an express contract exists between the parties." Albrecht, 357 F.3d at 69 (citing Schiff v. American Ass'n of Retired Persons, 697 A.2d 1193, 1194 & n. 2 (D.C. 1997)); see Seafarers Welfare Plan v. Philip Morris, 27 F. Supp. 2d 623, 635-36 (D. Md. 1998).

In Albrecht, the District of Columbia Circuit discussed the implications of an existing contract on an unjust enrichment claim. 357 F.3d at 62.  There, the plaintiffs alleged, inter alia, that the Board of Governors of the Federal Reserve System had been unjustly enriched and sought "the return of [the] mandatory contributions that [the plaintiffs] made into a defined-benefit pension plan after actuaries determined the plan was well-funded." Id. at 64.  When discussing the unjust enrichment claim, the District of Columbia Circuit held, relying on Schiff, 697 A.2d at 1194, that "there can be no claim for unjust enrichment when an express contract exists between the parties." Id. at 69.  Thus, because the pension plan governed the various aspects of the relationship between the parties, and nothing in that contract required the defendants to make refunds to employees if the plan had a surplus, "any 'enrichment' the [defendants] would enjoy if the [plaintiffs] receive surplus funds could not possibly be unjust." Id. at 69.

Here, the plaintiffs were under legal obligations, arising from the loan agreements, to pay the interest rates designated in those agreements.  However, this is not a case involving breach of contract, as the plaintiffs do not allege that the contracts have been breached or should be voided or that some other "quasi-contract" existed.  As discussed more fully below, the plaintiffs' claim for unjust enrichment and restitution is based upon an alleged violation of the APA.  See Compl. ¶¶ 49, 59 ("CCC regulations are arbitrary, capricious and an abuse of discretion").  Accordingly,

the defendants' argument that the plaintiffs are not entitled to unjust enrichment because their claim arises out of a contract is without merit.[7]

Thus, this Court must now address whether the plaintiffs' unjust enrichment claim is barred by the doctrine of sovereign immunity, which protects the government and its agencies from suit in the absence of its consent.  Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 260 (1999); Weinstein v. Islamic Republic of Iran, 274 F. Supp. 2d 53, 56 (D.D.C. 2003).  The APA waives sovereign immunity by "allowing the United States to be sued in the district courts for remedies other than money damages arising from an agency's unlawful action." 5 U.S.C. § 702; Bublitz v. Brownlee, 309 F. Supp. 2d 1, 5 (D.D.C. 2004).  However, there are several limitations on the APA's sovereign immunity waiver.  For example, the APA excludes:  (1) claims for "money damages;" (2) claims for which an "adequate remedy" is available elsewhere; and (3) claims seeking relief "expressly or impliedly" forbidden by another statute.  5 U.S.C. § 702, §704.  The Court needs to address only the first and third limitation and it will do so below.[8]

---

[7]  The defendants also contend that the plaintiffs cannot rely upon the Tucker Act, 28 U.S.C. § 1941 (2001), as legal support for their claim of unjust enrichment.  Defs.' Mem. at 17-18.  The Court does not need to address this argument since the plaintiffs contend that "[t]he Tucker Act does not apply to the instant matter because the [p]laintiffs have not asserted jurisdiction conferred by the Tucker Act."  Accordingly, this Court only need address whether sovereign immunity has been waived as to this claim under the APA.  Moreover, this Court also concludes that because the plaintiffs claim is not based on a contract, but rather the APA, the Tucker Act is inapplicable.  See 28 U.S.C. § 1491 ("The Tucker Act waives sovereign immunity for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express . . . contract with the United States, for liquidated or unliquidated damages in cases not sounding in tort.") (emphasis added).

[8]  The Court finds it unnecessary to undertake a review of the second exclusion because the defendants do not contend that there is an "adequate remedy" elsewhere.  The only other forum that could possibly address the plaintiffs' claim is the Court of Federal Claims under the jurisdiction of the Tucker Act.  As discussed above, however, the case before this Court is not based on contract, but rather a claim seeking equitable relief.  Accordingly, the Court of Federal Claims cannot provide an adequate remedy.  The Court of Federal Claims lacks "the general equitable powers of the district court," thus, it is not a forum that can provide an adequate remedy to the plaintiffs.  In re Sealed Case No. 99-3091, 273 F. Supp. 2d 3, 10 (D.D.C. 2002); see Transohio Sav. Bank v. Office of Thrift

(continued...)

16

**(1)      Are the Plaintiffs Seeking Monetary Relief or Money Damages?**

The plaintiffs claim that their unjust enrichment claim falls under the jurisdiction of the

APA because they are seeking "monetary relief," rather than "money damages," which are

forbidden by § 702 of the APA.  Pls.' Recons. Mot. at 5.  The Supreme Court in Bowen v.

Massachusetts, 487 U.S. 879, 895 (1988) defined money damages narrowly as "compensatory

relief. . . given to the plaintiff to substitute for a suffered loss."  Id. (emphasis in original).  Such

damages are not recoverable under the APA.  However, the Court distinguished money damages

from certain types of monetary relief it characterized as "specific relief," which is "an attempt to

give the plaintiff[s] the very thing to which . . .  [they] are entitled," and thus are recoverable

under the APA.   Id.   For example, such relief can include the recovery of specific "monies" by

the plaintiffs.  Id. at 893 (citing Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682,

688 (1949)).

In Bowen, the State of Massachusetts, a long time participant in the federal government's

Medicaid programs, provided medical and rehabilitative services to mentally handicapped

individuals through the State's Department of Mental Health and Education.  487 U.S. at 886.

---

[8](...continued)

Supervision, 967 F.2d 598, 608 (D.C. Cir. 1992) (holding that because the Claims Court could not grant the
equitable relief the plaintiff sought, it could not provide an adequate remedy.).

The defendants also argue that in addition to the Tucker Act, the plaintiffs ignore the reach of the Contract
Disputes Act ("CDA").  The CDA applies to "any express or implied contract . . . entered into by an executive
agency for (1) the procurement of property . . . ; (2) the procurement of services; (3) the procurement of construction,
alteration, repair, or maintenance of real property; or (4) the disposal of personal property."  41 U.S.C. § 602.  The
Court does not find that the plaintiffs contract with the CCC falls under any of these categories.  Thus, the CDA does
not govern the plaintiffs' claim.

In their reply to the defendants' opposition, the plaintiffs state that "in the instant case, restitution would be
a legal remedy in the instant case if awarded as an appropriate remedy for . . . violations of law [referring to the
alleged violations of the FRSI Act and the APA]."  Pls.' Reply to Defs.' Opp'n at 2.  However, the plaintiffs are
mistaken in this conclusion.  As stated above, only equitable remedies are available under the APA.  The plaintiffs
have clearly stated their intention to seek restitution, which is an equitable remedy under the APA.

17

The Secretary of the United States Department of Health and Human Services ("HHS") determined that only the services provided by the State's mental health employees qualified for reimbursement under the Medicaid program.  Id. at 887.  Therefore, reimbursement for the services provided by the State's education department were disallowed by HHS "as uncovered education services."  Id. at 886.  In response to HHS's decision, the State of Massachusetts filed suit in federal court under the APA, seeking reimbursement for the expenditures related to the services provided by its education department employees.  Id. at 887.  The Secretary of HHS argued in Bowen that Massachusetts should have brought its case in the United States Court of Federal Claims under the Tucker Act and that the APA did not vest jurisdiction in the district court because the State's claim was not an action "seeking relief other than money damages."  Id. at 890-91.  However, the Bowen Court decided that "the fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"  Id. at 893.  Instead, the Court viewed the district court's reversal of the Medicaid disallowance decision not as an award for damages, but rather as an "adjustment."  Id. Moreover, the Court noted that "Congress has used the terms 'overpayment' and 'underpayment' to describe such adjustments . . . and that the specific agency action that reverses a disallowance decision is described as 'restitution' in the statute."  Id.  The Supreme Court concluded that because the State sought specific relief to invalidate the Secretary's refusal to reimburse the State, as opposed to recovering money damages, the case was properly within the district court's jurisdiction.  Id. at 910.   Thus, the Court affirmed the district court's decision permitting the State to pursue the claim.

Similarly, in Zellous v. Broadhead Fording Associates, 906 F.2d 94, 96 (3d Cir. 1990), the Third Circuit held that tenants who claimed that the United States Department of Housing and Urban Development ("HUD") had violated the United States Housing Act of 1937, 42 U.S.C. § 1437 (1982 & Supp. v. 1987), as well as associated regulations and the APA, and sought reimbursement for rent due to HUD's failure to timely adjust their utilities allowances was not a claim for money damages, but rather for "specific relief." The court reasoned that "[u]nder Bowen, HUD is incorrect in characterizing the requested reimbursement as damages . . . [because] the tenants [sought] only that to which they were entitled . . . and thus the relief requested [was] 'other than money damages.'" 906 F.2d at 98 -99 (internal citations omitted). Here, as in Bowen and Zellous, the plaintiffs merely seek "reimbursement" for the amount of additional interest the CCC charged them in violation of the Act. An award of restitution for the surcharges that were allegedly illegally collected would therefore be an "adjustment," which under Bowen is not a claim to recover money damages. The claim therefore falls within the scope of the APA. Thus, the first limitation on the APA's waiver of the government's sovereign immunity is not a bar to this Court's exercise of jurisdiction in this matter.

**(2)    The Plaintiffs' Claims are not "Expressly or Impliedly" Forbidden by Another Statute.**

Sovereign immunity is waived pursuant to § 702 of the APA only if no "other statute that grants consent to sue expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The defendants argue that the existence of a contract between the parties "leads to a contractual analysis of their claims" and renders the plaintiffs' claim 'sufficiently contractual' to fall within

19

the jurisdiction of the Court of Federal Claims, therefore, precluding the plaintiffs from pursuing

relief under the APA.  Defs.' Opp'n to Pls.' Recons. Mot. at 1-2.  District of Columbia Courts

have "interpreted the Tucker Act as providing the exclusive remedy for contract claims against

the government, at least vis a vis the APA."  Transohio Sav. Bank, 967 F.2d at 609; see also

Sharp v. Weinberger, 798 F.2d 1521, 1523 (D.C. Cir. 1986).  Therefore, courts have determined

that § 702 of the APA does not waive sovereign immunity for contract claims against

government agencies.  Id.  This is so because § 702 "is by its terms inapplicable if 'any other

statute that grants consent to suit expressly or impliedly forbids the relief which is sought,' and

the Tucker Act . . . impliedly forbid[s] such relief."  Id. (citing Sharp, 798 F.2d at 1523).

Therefore, if this Court determines that the plaintiffs' case is a "contract case," the APA does not

waive sovereign immunity and the plaintiffs may not bring their claim under the APA.  Based on

these established principles, the defendants' argue that because the plaintiffs entered into a

contractual agreement with the CCC, the Supreme Court's holding in Bowen does not apply

here.  Defs.' Opp'n to Pls.' Recons. Mot. at 2.  According to the defendants, the parties in Bowen

were engaged in an "on-going, regulatory scheme," instead of a traditional, contractual

agreement.[9]  Id. at 4.  They contend that the existence of a "concrete" and "annual" contract here

is what distinguishes the instant case from Bowen.  Id. at 5.

_____

[9] The defendants cite cases in their Opposition to Plaintiffs' Emergency Motion to Alter or Amend in which
the plaintiffs had non-contractual relationships with federal agencies who had regulatory statutory authority over
them and were seeking relief under the APA instead of money damages.  Defs.' Opp'n at 4-5 (citing Bowen, 487
U.S. at 879); Am. Cmty. Bankers v. FDIC, 200 F.3d 822 (D.C. Cir. 2000)).  However, these cases do not preclude
the conclusion that claims brought under the APA, in which the parties who have a contractual relationship, can be
entitled to relief under the APA.

The plaintiffs counter that, although a contract has been in existence between the plaintiffs and the CCC, this is nonetheless not a contract case. Pls.' Opp'n at 17-18. In Transohio Sav. Bank, the District of Columbia Circuit articulated a test to determine whether a case is a "contract case" for APA and Tucker Act purposes. 967 F.2d at 609. Whether a claim is a contract claim, and therefore not subject to APA jurisdiction, depends upon "whether, despite the presence of a contract, [the] plaintiffs' claims are founded only on a contract or whether they stem from a statute or the Constitution." Id. Sharp v. Weinburger presents a clear application of this rule. In Sharp, the Department of Defense revised its regulations to require that all members of the Ready Reserve who were also considered "key" federal employees, be transferred to Standby Reserve service. Sharp, 798 F.2d at 1521. Based upon the revised regulation, the plaintiff, a member of the Ready Reserve, was transferred to Standby Reserve service. Id. The plaintiff filed a lawsuit seeking to prevent the Secretary of Defense and the Secretary of the Air Force from implementing the transfer, alleging, among other things, that he had a binding contract with the Department of Defense and therefore a property interest in his position as a Ready Reserve member, which the Department of Defense was attempting to take away without due process of law. Id. at 1523. The District of Columbia Circuit concluded that the district court lacked jurisdiction over the plaintiff's contract claims because Tucker Act jurisdiction over those claims was exclusive and § 702 of the APA did not waive sovereign immunity as to such claims. Id. However, Sharp was allowed to bring in district court his claims that the Department of Defense's actions violated federal statutes and regulations. Id. at 1524. Moreover, according to the Transohio Court, Sharp stands for the proposition that "litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and

21

terms of a contract with the government." Id.  Other decisions in this Circuit have similarly

concluded that the mere existence of a contract does not necessarily mean that a case is

"contractual" and thus, not subject to APA jurisdiction.  See Spectrum Leasing Corp. v. United

States, 764 F.2d 891, 893 (D.C. Cir. 1985) ("A court will not find that a particular claim is one

contractually based merely because resolution of that claim requires some reference to a

contract"); Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982) ("The mere fact that a

court may have to rule on a contract issue does not, by triggering some mystical metamorphosis,

automatically transform an action based on trespass or conversion into one on the contract and

deprive the court of jurisdiction it might otherwise have.").

Moreover, other federal courts have frequently allowed the award of equitable relief

under the APA in cases where contracts existed.  In Katz v. Cisneros, 16 F.3d 1204, 1205 (Fed.

Cir. 1994), the plaintiff filed a claim based upon Section 8 of the Moderate Rehabilitation

Program of the United States Housing Act of 1937, 42 U.S.C. § 1437, a statute designed to aid

low income families with their housing costs and administered by HUD.  16 F.3d at 1205.   In

Katz, a housing assistance payment contract to subsidize the rent of low-income tenants was

entered into between HUD and a local government housing agency.  Id.  Once the contract was

executed, the local housing agency sought proposals from and entered into contracts with local

developers to participate in the program.  Id.  All of these contracts contained provisions

designating the contract rent amounts, which was calculated in accordance with HUD

regulations.  Id.  HUD determined that the rent being charged by the local developer exceeded the

amount of rent permitted under the contract and HUD regulations.  Id. at 1206.  The local

developer disagreed, and brought suit in district court seeking a declaratory judgment and

pursued claims for, among other things, "breach of federal common law duty . . . and breach of

contract . . . ." Id. The district court held that because the suit was based in contract, jurisdiction

had been vested with the Court of Federal Claims pursuant to the Tucker Act. Id. at 1207.

However, on appeal, the Federal Circuit, applying Bowen, concluded that the developer's suit

was not a "contract case . . . [because the plaintiff did] not seek declaratory relief in the

performance of a contract, but [sought] judicial interpretation of a federal regulation." Id. at

1209. Furthermore, the court concluded that the plaintiffs sought equitable relief not money

damages.[10] Id. at 1207. Accordingly, the Federal Circuit reversed and remanded the case back

to the district court. Id. at 1210.

In another case before the Federal Circuit, James v. Caldera,159 F.3d 573, 580 (Fed.

Cir.1998), the court held that if a case is carefully plead, an army officer seeking retroactive re-

enlistment would have jurisdiction under the APA. Id. In James, a non-commissioned officer in

the United States Army, brought a mandamus action against the Secretary of the Army for

allegedly wrongfully denying him a five month extension of his enlistment in violation of his due

process rights. According to the plaintiff, if his extension had been granted, he would have been

eligible for retirement benefits. Id. at 575. He requested an order from the court that he be

allowed to reenlist in the Army, which, if granted would make him eligible for retirement

---

[10] The Federal Circuit distinguished its ruling in Katz from Brighton Vill. Associates v. United States, also a Section 8 case involving a landlord that had a contractual agreement with HUD. In Brighton Village, the landlord sued HUD for failing to adjust rents allegedly in violation of HUD's regulations. 52 F.3d 1056, 1057 (Fed. Cir. 1995). The court held that the Katz decision did not deprive it or the Court of Federal Claims of jurisidction for several reasons. Id. at 1059-60. The Federal Circuit concluded that Katz "differ[ed] from [Brighton Village] in a very important way." Id. at 1059. Namely, "[i]n Katz, the contractor was not in privity with the Government but with a local agency that administered the Section 8 program." Id. at 1059. Therefore, Katz "did not feature a contract claim against the Government." Id. On the other hand, the contractor in Brighton Village had a contract directly with HUD. Id. at 1060. Accordingly, the Federal Circuit held that the Court of Federal Claim properly exercised jurisdiction. Id.

benefits.  Id.  According to the Court of Federal Claims,  "the plaintiff's claim [for an enlistment

extension could] properly be viewed as one for damages as well as injunctive relief," depending

on how the plaintiff stated his claim.  Id. at 578.   The Federal Circuit concluded that his claims

with respect to the bar to reenlistment, were not for money damages and therefore the Court of

Federal Claims lacked jurisdiction to entertain them.  Id. at 580.   However, the court found that

the plaintiff's claim for an extension of his enlistment may have been for money damages, and if

so the Court of Federal Claims would have authority to exercise jurisdiction over the claim.  Id.

But, because the court was unable to make that determination on the record it had before it, that

issue had to be remanded to the district court for its initial determination.  Id. at 583-84.

Here, although there is an express contract between the plaintiffs and the CCC, the

plaintiffs' claim does not arise from the contract itself, rather, it arises under the APA.  The

plaintiffs filed this action because the additional one percent interest charge the CCC applied to

the sugar loans conflicts with the express language of the FAIR Act, as amended by the FSRI

Act, and therefore violates the APA.  Compl. ¶¶ 49, 59.  Thus, the plaintiffs claim clearly arose

from the statute and regulation which interpreted it, not from an alleged contract breach.  As has

been noted, "[e]ven where a case is contractual, . . .  the presence of issues which require the

interpretation of federal law and regulation necessarily give rise to federal questions" and thus,

federal district courts have jurisdiction under the APA, as opposed to jurisdiction lying in the

Court of Federal Claims under the Tucker Act.  Katz, 16 F.3d at 1207.  Accordingly, this Court

rejects the defendants' argument that the existence of the contract necessarily places the

plaintiffs' claim under the jurisdiction of the Tucker Act.  This Court finds that the Supreme

Court's holding in Bowen applies here because, as stated above, the plaintiffs were seeking

reimbursement of money paid to the government, which amounts to a request for specific relief under the APA.  Like the plaintiffs in the <u>Sharp</u>, <u>Katz</u>, and <u>James</u>, the plaintiffs are seeking repayment of money they contend they are owed.  For example, in <u>Katz</u>, HUD incorrectly calculated the permissible rent amounts that could be charged and thus the developer sought to recover the money he had not received, which the Federal Circuit held was an action for equitable relief rather than for money damages.  16 F.3d at 1209-10.  Thus, the claim was held to fall under the jurisdiction of the APA.  <u>Id.</u>  Here, the CCC illegally charged the plaintiffs excessive interest on sugar loans and they seek reimbursement of those payments.  Restitution of this nature is authorized under the APA because none of the APA limitations on the waiver of sovereign immunity apply to such relief.  Therefore, because the Court has concluded that the agency has illegally charged the additional one percent interest point for the sugar loans, the plaintiffs are entitled to restitution under the APA.[11]

## IV.   Conclusion

For the foregoing reasons, this Court concludes that the defendants' additional one percent interest rate assessment on the sugar loans made to the plaintiffs conflicts with the express language of the 2002 Act.  Accordingly, its assessment is "arbitrary, capricious, . . . or otherwise not in accordance with law" and therefore violative of the APA, 5 U.S.C. § 706(2)(A).  Thus, the plaintiffs are entitled to judgment as a matter of law on counts one and two of their

---

[11]  In their opposition, the defendants reference the CCC's sue-and-be-sued statute, 15 U.S.C. § 714(b), and state that it does not permit "injunctive relief" against the CCC.  Defs.' Opp'n at 4.  This statute states that the CCC may "sue and be sued, but no attachment, injunction, garnishment, or other similar process . . . shall be issued against the Corporation or its property." 15 U.S.C. § 714b.  This limitation does not bar the recovery of restitution, nor does this Court find that restitution is "similar" to an attachment, injunction or garnishment.

amended complaint.[12]   Furthermore, the Court concludes that the APA waives the defendants'

sovereign immunity regarding the plaintiffs' claim of unjust enrichment and the plaintiffs are

therefore entitled to the specific relief they have requested.

**SO ORDERED** this day of 6th day of January, 2005.[13]

REGGIE B. WALTON
United States District Judge

---

[12]  As noted earlier, because this Court has concluded that the defendants' actions violate both the express terms of the 2002 Act and the APA, 5 U.S.C. § 706(2)(A), it need not reach the issue raised in count four of the amended complaint—whether the interest rate amounted to an unconstitutional tax.

[13]  An Amended Order consistent with the Court's ruling accompanies this Amended Memorandum Opinion.